SEBASTIAN COUNTY BANK v. GANN.

Opinion delivered November 8, 1915.

1. FRAUD—REPRESENTATIONS—SALE OF STOCK.—The cashier and vice-president of a bank induced appellees to purchase stock in the same, representing that the bank was solvent. Appellees gave their note for the amount due on the purchase and accepted two 10 per cent. dividends on the stock. *Held*, under the facts there was no fraud on the part of the bank's officers, and that appellees were liable for the amount of their notes, although the bank later became insolvent.

2. FRAUD—REPRESENTATIONS—KNOWLEDGE—WAIVER OF DEFENSE.—Appellees purchased stock in a bank, giving their notes therefor, upon the request and representations of certain of the bank's officers. *Held*, when thereafter appellees, as stockholders, had an opportunity to investigate the bank's condition, and executed renewal notes for their stock, that they will be held to have waived the defense of fraud on the part of the bank's officers in an action by the bank against them, to collect on their notes.

Appeal from Sebastian Chancery Court, Greenwood District; *William A. Falconer,* Chancellor, reversed.

STATEMENT BY THE COURT.

Appellants brought these suits, which were afterwards consolidated, against appellees, upon two promissory notes, for $1,590 each, given in payment for stock of the Sebastian County Bank, of the face value of $1,000.

Defendants answered, admitting the execution of the notes and denied liability thereon, alleging that they were procured by false and fraudulent representations of R. O. Herbert, cashier of the bank, that the stock was worth $1.59 on the dollar, when as a matter of fact, it was worth very much less; that shortly thereafter the bank became, and it was disclosed by an examination of its affairs about July 1, 1912, that it was insolvent and the stock practically worthless, and prayed that the notes be cancelled. The cases were transferred to equity.

The testimony shows that R. O. Herbert, one of the organizers of the bank, and who had been its cashier from the organization, made the statement to the appellees about the time of their purchase of the stock, in March

or early in April, 1911, that the stock was worth $1.59 on the dollar and they gave their notes for $1,590 each, in payment for stock of the face value of $1,000. Shortly thereafter a dividend of 10 per cent. was declared and they each received the amount of the dividend and the notes were renewed and later again renewed in 1912, when the payment of another dividend of 10 per cent. was made and received.

Gann testified that he had borrowed considerable money from the bank and was approached by Herbert, the cashier about the first of March, 1911, who wanted him to take $1,000 of its stock. That a few days later, Fred McCord, brother of J. P. McCord, the other appellee, and vice-president of the bank solicited him to take the stock and informed him that it was good and safe to buy and would make him money; that Fred McCord said he wanted him and Jim McCord in the bank as stockholders for the reason that there was talk of putting in another cashier in Herbert's place and if they would take $1,000 each, they would have the majority of the stock and could control the bank. That later he was in the bank and Mr. Herbert, the cashier, solicited him to buy the stock and told him it could pay itself out, that the bank would double its stock after the following July and said, "It could lay right there and pay itself out." He told him it was worth $1.59 and a money making thing. He admitted that he asked about the value of the stock after the first renewal of the note and learned before the second renewal that it was worth about 90 cents.

J. P. McCord testified that his brother Fred was the first to speak to him about purchasing the stock, and that Mr. Herbert also wanted him to take stock; that his memory was refreshed as to accommodations that had been granted him; he was told that it would be a help if he would take $1,000 worth of stock, for which he could give his note to the bank and assured him that the stock would take care of itself. He said further he had heard something about the Greenwood Coal & Lumber Company owing the bank a good deal, but was assured by the cash-

ier, Herbert, that said company and McFarlane owed the bank a minimum; that Herbert said the stock was gilt-edge stuff, worth $1.59, and he finally agreed to take it in February or March, 1911, relying upon what Herbert had said, and gave the bank a note payable on the 1st of July, 1911, and on that day renewed the note payable next July; that he gave a check for $159 interest on the note, and was given credit by the bank on his account for $100 dividend on the stock.

That this transaction was between the 1st and 8th of June, 1912; this took place just before the bank was closed.

He admitted receiving two 10 per cent. dividends on his stock, one in July, 1911, and the other in June, 1912. He said he felt like he had to help Mr. Herbert to take the stock, and that he was assured by him that it would take care of itself and something was said about doubling or increasing the stock; that he owned $1,000 of the bank's stock before he gave a note for this.

Fred McCord testified that he was vice president of the bank, and had a talk with Mr. Herbert, the cashier, about the Greenwood Coal & Lumber Company's indebtedness, but thought it was after the purchase of the stock by the defendant. He knew nothing of the bank's condition, except upon information from Herbert, the cashier, who told him that the Greenwood Coal & Lumber Company's indebtedness had been taken up. Said his brother Jim talked to him about the value of the stock before he bought the last $1,000 worth, and he told him he thought it was a good stock, and witness did not know anything else about it.

Herbert testified that he was cashier of the bank from its organization until 1912; that the capital stock was $5,-000 up to 1900; $10,000 up until 1905, and then increased to $25,000; it earned 10 per cent. the first year; the second year 37.15. In 1901 20 per cent. on $10,000; 1906 to 1911 the earning was 10 per cent. on $25,000; the surplus in 1906 over $2,000; 1907 nearly $3,000; 1908 to 1911, $2,000 each year.

He sold Gann & McCord stock at $1.59 which had originally been McFarlane's, and was taken in by the bank on his indebtedness. Said it developed in 1912 that the bank had a note on the Greenwood Coal & Lumber Company for $5,000, and an overdraft of about the same amount; because of the failure of that company, which was regarded good in 1911, and because of the death of John Rutherford and the insolvency of McFarlane occasioned by two expensive and unsuccessful political campaigns, the bank became insolvent. Said he thought the stock was worth $1.59 at the time he sold it to the defendants, and at the time of his testifying still thought it was of that value at that time. That Rutherford, who was responsible on all the paper of the Greenwood Coal & Lumber Company and McFarlane were both solvent then and that Rutherford was regarded as one of the richest men in the State, having large and extensive interests in different portions of it. That the Greenwood Coal & Lumber Company, or Rutherford and McFarlane for it, in April, 1911, deposited $15,000 in the bank, which paid up its overdraft and left a credit of three or four thousand dollars. That he had no doubt at the time of the sale of the stock but that it was worth what he stated it to be, and that it did not develop until long afterward, the death of Rutherford intervening, and the insolvency of McFarlane, which rendered the paper of three of the concerns which were indebted to it, of doubtful value and finally caused the insolvency. He had no doubt but that all the paper secured by Rutherford was good until after his death, when it developed his finances were in bad condition.

Miss Alta Blaylock stated that she was assistant cashier of the Sebastian County Bank, between July 1, 1910, and July 1, 1911. The bank value of the stock was $1.54; that its net earnings for 1910 were $4,738.97, and its net earnings for 1911 were $4,584.15. She also submitted a statement of its resources at that time.

The Greenwood Coal & Lumber Company was overdrawn nearly $11,000, which was covered by a deposit on April 3, 1911, leaving to its credit $3,702.22. In June,

1912, appellee, J. P. McCord, sold to J. H. Holland $1,000 of his stock in the bank for which he was paid $1,750. J. A. Norris stated that he endorsed the note with R. W. McFarlane and John H. Rutherford by which they procured from the First National Bank, of Fort Smith, on April 1, 1911, $15,000, and that McFarlane at the time made him a financial statement, showing his net worth to be $25,000; that he considered both McFarlane and Rutherford solvent then. Several other witnesses testified to the same effect.

The chancellor found that the notes were obtained by false and fraudulent representations as to the value of the stock which avoided the transaction, that the Sebastian County Bank took them over after the maturity thereof, and rendered a decree in favor of the defendants, from which the bank appealed.

*Geo. W. Johnson* and *Rose, Hemingway, Cantrell, Loughborough & Miles,* for appellants.

1. It was error to hold that the representations made by Herbert were false, fraudulent and made with intent to have the defendants to act upon them to their injury. This court has frequently approved the rule that, "Representations, to be fraudulent, must be material to the contract and 'must be made by one who knows them to be false, or else, not knowing, asserts them to be true, and made with the intent to have the other party act upon them to his injury; and such must be their effect.' " 73 Ark. 542; Cook on Corporations (4 ed.), § 149; 38 Ark. 334-340; 125 U. S. 247; 55 Atl. 514; 85 S. W. 219; 99 Ark. 438; 97 Ark. 15; 91 Ark. 324. See, also, 44 Atl. 694; 1 Ark. 31; 72 N. W. 522; 25 S. W. 1054; 67 S. W. 736.

2. The court erred in holding that the defense of fraudulent representations was available to appellees: (1) The rights of creditors had intervened, and appellees could not deny their liability on their stock subscriptions. 181 U. S. 202-215; 219 Fed. 1017; 92 Fed. 13-19; 160 Fed. 573; 30 S. E. 492. (2) After two renewals of these notes and receiving and accepting dividends, and after the lapse of fifteen or sixteen months, appellees are

estopped from denying liability on the notes as between themselves and the bank, without regard to the rights of creditors. 111 Ark. 358; 177 S. W. 429; 44 N. E. 552; 35 Pac. 697; 45 So. 29; 57 So. 206.

C. E. & H. P. Warner and C. R. Warner, for appellees.

1.   The statement of fact made by Herbert which appellees alleged was a false statement, was proved by appellees to have been made, and Herbert admitted it.   It was also proved, and not denied that this was the inducement to the making of the notes in question by the appellees, and it was shown that Herbert made the statement with the specific intent to induce appellees to give their notes.

If Herbert procured these notes by means of false representations as to the value of the stock known by him to be false, the judgment must be affirmed.  22 Ark. 521; 97 Ark. 269; 64 Ark. 17; 38 Ark. 346; 30 Ark. 373.  See, also, 9 Bush. 609; 4 Thompson on Corporations, 4024; 118 N. C. 311; 24 S. E. 478; 122 N. C. 365; 29 S. E. 829; 97 Ky. 713.

2.   There is no testimony in the record to show that appellees were held out to the world as stockholders, and that rights of creditors had intervened, nothing tending to show that any persons other than appellees and Herbert actually knew that they had purchased this stock. Authorities cited by appellants on this question have no application.

On the question of estoppel, the authorities relied on by appellants establish the rule that the renewal notes, in order to operate as an estoppel, must have been given *with knowledge of the fraudulent statements, or the opportunity of being informed as to the facts in respect to such statements.*

KIRBY, J., (after stating the facts).   (1)   In *Evatt v. Hudson,* 97 Ark. 268, the court said, ''Representations, to be fraudulent in law, must be material to the contract or transaction, which is to be avoided and 'must be made by one who either knows them to be false, or else not knowing asserts them to be true and made with the intent

to have the other party act upon them to his injury, and such must be their effect'. '' *Louisiana Molasses Co. Ltd.* v. *Fort Smith Wholesale Gro. Co.,* 73 Ark. 542; *Jarratt* v. *Langston,* 99 Ark. 442.

In *First Nat'l. Bank of Newark* v. *People's National Bank of Springfield,* 97 Ark. 15, the court said: ''A false representation, to be actionable, must not only mislead, but must be made fraudulently and with that intent. No one can be held liable for a false representation, who honestly believed it when made, however false it may be, but he is liable if he knew it to be false, or knowing nothing about it, asserts it to be true.''

It is not disputed that the bank cashier represented to the purchasers of the stock that it was worth $1.59, and that these representations were made at the time they were solicited to become purchasers, and with the view of inducing them to do so, but contended only that the representations were honestly made in the belief that they were true, with the knowledge of the cashier of the bank's condition. It was the intention of the cashier of the bank and the vice president, McCord, the brother of one of the appellees, who purchased the stock, in inducing them to take it, to secure a majority of the stock of the bank in the hands of the cashier, and those friendly to him, in order that he might be continued as cashier thereof, and the purpose was so stated by them to the purchasers of the stock. The cashier was fully informed of the bank's condition, and testified that he made the statement relative to this value of the stock, and that he not only believed it to be true at that time, but still believed at the time he testified after the failure of the bank because of conditions that afterward developed, that the stock was of that value at the time of the sale of it to appellees. The bank had paid good dividends upon the stock from its organization and upon every increase of its stock to and including the time of the purchase by appellees and one year thereafter. The amount of these dividends were disclosed by the testimony, and a dividend of 10 per cent. was declared and paid upon the stock shortly after its purchase by appellees, and one of like amount one year thereafter, with a surplus of $2,-

000 set aside each of said years. The bank was declared insolvent in June, 1912, because of the depreciation of certain of its assets on account of the failure and insolvency of some of its debtors, some of whom were indebted to it in rather large amounts at the time of the purchase of the stock by appellees. The cashier and others testified however that these debtors were solvent and able to pay the amounts they were due the bank at the time of the sale of the stock, except the Greenwood Coal & Lumber Company, and that its paper was secured by the endorsement of R. W. McFarlane, who was regarded financially sound at that time, and John F. Rutherford, who had the reputation of being a very wealthy man. Said company, through its said endorsers on April 3, after the sale of the stock procured a loan from a bank in Fort Smith of $15,000, and deposited it, covering its overdraft and leaving a balance to its credit of more than $3,000. Said company continued to do business with appellant bank and was indebted on overdraft at the time of its failure in the sum of about $6,000. McFarlane's affairs became involved, and after making two expensive and unsuccessful political campaigns, he became insolvent, and Rutherford later died, and his affairs were discovered to be greatly involved. No one testified that McFarlane and Rutherford's endorsement and liability to the payment of the indebtedness due the bank from them and their concerns, was not good, nor that they were not solvent and well able to meet all their obligations at the time of the sale of this stock, and one of appellees sold $1,000 of his stock in the bank as late as June, 1912, at $1.75.

The strong inference of fact that the representations as to the value of the stock were false when made, arose from the fact that said certain parties were indebted to the bank at the time of the sale of the stock, and a considerable time thereafter became insolvent, destroying the value of their endorsement and of the bank's assets, which they were liable to the payment of. We do not think, however, that the testimony warrants the chancellor's findings that the representations relative to the

value of the stock were false and fraudulently made with intent to have the purchasers act upon them to their injury. The burden of proof is upon the appellees, and the chief purpose, as disclosed in the sale was to place the majority of the stock of the bank in the hands of friends of the cashier, who had successfully managed its affairs from its organization till then, in order that he might continue to do so and the clear preponderance of the testimony shows that the representation as to the value of the stock was substantially true. Moreover, the appellees received two 10 per cent. dividends upon the stock purchased and twice renewed the notes given in payment therefor, and if they desired to avoid the payment of the notes given for the purchase of the stock, they should not have renewed the notes nor waited until after the failure of the bank to do so.

If it be urged that they had no knowledge of the falseness of the representations made to induce them to purchase the stock and execute their notes in payment therefor until after the two renewals of the notes more than a year after such purchase, which was disclosed as they contend, by the bank's failure, it argues that they gave no heed to the affairs of the bank in which they were stockholders, and did not take advantage of the opportunity to inform themselves of its condition and the fact that its unsound condition was not sooner discovered, supports the view that it did not exist at the time of the sale of the stock.

(2) They either had knowledge or should have learned from their connection with the bank as stockholders and knowledge of its condition, that the representations made to them were false, before the last renewal of the note in any event, and being chargeable with knowledge thereof, waived such a defense by said renewal. *Stewart* v. *Simon,* 111 Ark. 358, and cases cited; *Haglin* v. *Friedman,* 177 S. W. (Ark.) 429, 118 Ark. 465.

It follows that the chancellor erred in the decree rendered, which is reversed and the cause remanded with directions to enter a judgment in appellants' favor for the amount of the notes sued on.