Cite as 2021 Ark. App. 72

# ARKANSAS COURT OF APPEALS

DIVISION III

**No.** CV-19-112

| | | |
|---|---|---|
| WILLIAM M. HOGAN | | **Opinion Delivered:** February 17, 2021 |
| | APPELLANT | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, TWELFTH DIVISION [NO. 60CV-15-4086] |
| V. | | |
| BANK OF LITTLE ROCK | | HONORABLE ALICE S. GRAY, JUDGE |
| | APPELLEE | |
| | | AFFIRMED |

## ROBERT J. GLADWIN, Judge

William Hogan appeals from the judgment of the Pulaski County Circuit Court in favor of appellee Bank of Little Rock (BLR or the bank) in an action to recover on a note he signed for a loan the bank made to Sports Cards Plus, Inc. (SCP), and John Rogers. The central issues are whether Hogan was an accommodation party on the note and whether he had waived his defenses to repayment of the note. The circuit court answered both questions in the affirmative. We agree with the circuit court and, accordingly, affirm.

The facts concerning the execution of the notes are not in material dispute, although the parties bitterly dispute the conclusions that can be drawn from those facts. Photo Archive Partners (PAP) was an entity formed by Hogan, Rogers, and Chris Cathey in late 2011 or early 2012. Hogan and Rogers each owned 40 percent of PAP, while Cathey owned the remaining 20 percent. PAP had acquired the photo archives of various newspapers to

digitize the photographs. PAP would then return the digital library to the newspapers in exchange for the photographs and licensing rights for the digital images. The actual work of digitizing the photographic archives was to be performed by SCP, a separate entity owned entirely by Rogers.

By late 2013, SCP needed additional equipment to scan and digitize the large number of photographs that had been accumulated and still needed processing. Rogers approached Hogan and told Hogan that he had a deal for a discount on such equipment if it were purchased by a certain date and asked Hogan if he knew of any banks that would want to finance the purchase. Hogan had previously borrowed from BLR on behalf of a family trust and had paid the loan off early. Hogan arranged a meeting between Rogers and two BLR representatives, Eugene Maris and Steven Plunkett, in mid–December 2013.

BLR approved the loan in the principal amount of $900,000. The proceeds were to be used by SCP to purchase the additional scanning and digitizing equipment, which was to serve as collateral to secure the loan. The note identified the bank as the lender and SCP as the borrower. On December 23, 2013, Rogers signed the note both individually and as president of SCP. Hogan did not sign the note at that time. On December 24, the bank wired the loan proceeds to the purported seller's account using information that Rogers had provided. Although BLR received an acknowledgement that the funds had been received, it did not verify the legitimacy of the seller or the account information before wiring the funds. The proceeds were never actually used to purchase the equipment, and the equipment was never obtained by SCP.

Although he had not previously agreed to be obligated on the note, Hogan met with BLR's Steven Plunkett in mid-January 2014 to sign the note. At the time, Hogan was aware that the loan proceeds had already been disbursed; however, he was not aware that the equipment had not been purchased with the loan proceeds. He later testified that Plunkett told him when he signed the note that the equipment had been purchased.

On January 28, 2014, the FBI conducted a raid targeting Rogers. Not long after that raid, Hogan spoke with Rogers and learned that the equipment had not been purchased. Hogan and Cathey then approached the bank, told the bank that the equipment had not been purchased, and offered to substitute some of the photo archives as collateral for the loan in place of the equipment.

The bank prepared a second note reflecting the substitution of collateral. The purpose of this second note was to refinance the original note and to substitute the collateral. This second note, signed on March 12, 2014, again identified BLR as the lender and SCP as the borrower. Rogers signed the note both individually and as president of SCP, and Hogan signed in his individual capacity. The second note had a signature blank for Cathey; however, he did not sign the note. The substitute collateral included certain photo archives as Hogan had proposed to the bank.

Following execution of the second note, SCP made three payments of approximately $30,000 each to the bank. Thereafter, Hogan personally made payments totaling $244,000 toward the note. These payments occurred after the FBI raid.

On August 31, 2015, the bank filed its complaint against Hogan seeking to collect on the note. Hogan timely filed an answer in which he admitted that he had executed the

original note and the second note. Hogan generally denied any liability to the bank or that the note was in default. However, Hogan admitted that he had made certain payments to the bank well after he had learned of the misappropriation of the proceeds from the note. Hogan further alleged that the bank's claim failed for lack of consideration because he executed the note after the proceeds of the loan were disbursed. Hogan also asserted that he should be relieved of liability on the note because the bank failed to follow ordinary banking procedures in verifying and taking control of the collateral securing repayment of the note.

Hogan also included a counterclaim in his answer, alleging that the bank owed a duty of ordinary care and that it breached that duty by negligently failing to verify the existence of the collateral. Hogan's counterclaim further alleged that the bank negligently misrepresented the existence of the collateral. Finally, Hogan alleged that the bank owed him a fiduciary duty and that it breached this fiduciary duty by failing to verify the existence of the collateral.

A bench trial was held over several days in February and March 2018. The parties submitted pretrial briefs, posttrial briefs, and written closing arguments. On September 24, 2018, the circuit court entered its judgment finding that Hogan was an accommodation party on the notes rather than a guarantor. The court further found that because Hogan had made payments on the loan totaling $244,000 and had approached the bank about executing the second note after learning that the equipment had not been purchased, he had waived his claims and defenses against the bank, including impairment of collateral and his counterclaim for negligence. Accordingly, the court concluded that the bank was entitled to judgment in the amount of $590,833.27, together with accrued interest of $140,616.96;

4

and late fees and costs of $18,450.23. The court also awarded prejudgment interest, a reasonable attorney's fee, and postjudgment interest on the judgment. The court further dismissed Hogan's counterclaim and affirmative defenses as having been waived by his payments on the notes. This appeal followed.

Our standard of review on appeal in civil bench trials is whether the circuit court's findings are clearly erroneous or clearly against a preponderance of the evidence. *Thompson v. Broussard*, 2017 Ark. App. 423, 526 S.W.3d 899. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court, on the entire evidence, is left with a firm conviction that a mistake has been made. *Id*. We must give recognition to the circuit court's superior opportunity to determine the credibility of witnesses and the weight to be given to their testimony. *Id*.

For his first point, Hogan argues that the circuit court erred in finding that he signed the notes as an accommodation party instead of as a guarantor. This distinction is an important one. If Hogan is an accommodation party, he cannot raise failure of consideration as a defense to repayment.

Arkansas Code Annotated section 4–3–419(a) (Repl. 2020) defines an accommodation party as one who "signs the instrument for the purpose of incurring liability on the instrument without being a direct beneficiary of the value given for the instrument[.]" The comments to section 4–3–419 further explain that "[a]n accommodation party is a person who signs an instrument to benefit the accommodated party either by signing at the time value is obtained by the accommodated party or later, and who is not a direct beneficiary of the value obtained." Ark. Code Ann. § 4–3–419(a) cmt. A person who

signs an instrument as an accommodation party "may sign the instrument as maker, drawer, acceptor, or indorser, and, subject to subsection (d), is obliged to pay the instrument in the capacity in which the accommodation party signs." Ark. Code Ann. § 4–3–419(b). "The obligation of an accommodation party may be enforced . . . whether or not the accommodation party receives consideration for the accommodation." Ark. Code Ann. § 4–3–419(b). Comment 1 to section 4–3–419 offers the following example:

> If X cosigns a note of Corporation that is given for a loan to Corporation, X is an accommodation party if no part of the loan was paid to X or for X's direct benefit. This is true even though X may receive indirect benefit from the loan because X is employed by Corporation or is a stockholder of Corporation, or even if X is the sole stockholder so long as Corporation and X are recognized as separate entities.

Ark. Code Ann. § 4–3–419 cmt. 1

Whether one is an accommodation signer is a question of fact. *Cranfill v. Union Planters Bank, N.A.*, 86 Ark. App. 1, 158 S.W.3d 703 (2004); *Womack v. First State Bank*, 21 Ark. App. 33, 728 S.W.2d 194 (1987). The intention of the parties is the most significant element in determining accommodation status, and when a person receives no direct benefit from an executed note, it is likely that he will be regarded as an accommodation party. *Mobley v. Harmon*, 304 Ark. 500, 502, 803 S.W.2d 900, 901 (1991); *Cranfill*, 86 Ark. App. at 11, 158 S.W.3d at 709.

To support his argument that he is a guarantor, Hogan cites several circumstances, such as the bank's not seeking his signature until after the loan proceeds had been disbursed or in listing him as a guarantor in the loan request documents, that he contends support the conclusion that he is a guarantor. The fact that he did not sign the note until after the proceeds had been disbursed is of no moment because the comments to section 4-3-419

specifically contemplate that an accommodation party may sign the note sometime later than the principal obligor.

Hogan also argues that he derived a direct benefit from the loan proceeds as a member of PAP.[1] We disagree. Such a benefit would, in any event, be an indirect benefit because neither Hogan nor PAP received any of the proceeds from the loan. *Nelson v. Cotham*, 268 Ark. 622, 595 S.W.2d 693 (Ark. App. 1980). The loan was made to SCP—an entity owned entirely by Rogers—to acquire equipment to digitize photos belonging to PAP. Hogan did not exercise control over the loan proceeds. Hogan testified that the only way PAP makes money is by selling memorabilia or photos. The mere expectancy to receive an indirect benefit from the note is insufficient to render Hogan a guarantor. We cannot conclude that the circuit court's findings that Hogan received nothing from the proceeds of the note and was an accommodation party are against the clear preponderance of the evidence.

Hogan's second point is that the circuit court erred in finding that he had waived all his defenses to repayment instead of only those defenses he was aware of at the time he executed the notes. We disagree.

Waiver is the voluntary abandonment or surrender by a capable person of a right known by him to exist, with the intent that he shall forever be deprived of its benefits, and it may occur when one, with full knowledge of the material facts, does something that is inconsistent with the right or his intention to rely upon it. *Travelers Cas. & Sur. Co. of Am. v. Cummins Mid-South, LLC*, 2015 Ark. App. 229, 460 S.W.3d 308. Whether a waiver

---

[1]He testified: "I had discussions with Mr. Rogers about acquiring new equipment for [SCP] for the purpose of making money for [PAP]. These discussions were in connection with the loan from [BLR]."

occurred is a question of intent, which is usually a question of fact. *Id.* Therefore, on the issue of waiver, we do not reverse the circuit court's finding of fact unless it is clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Id.*

It has long been the law in Arkansas that one who gives a renewal note with knowledge of a failure of consideration for the original note waives such a defense and cannot use it to defeat or reduce a recovery on the note. *Harrington v. Citizens' Inv. & Sec. Co.*, 160 Ark. 320, 254 S.W. 831 (1923); *Haglin v. Friedman*, 118 Ark. 465, 177 S.W. 429 (1915); *Stewart v. Simon*, 111 Ark. 358, 163 S.W. 1135 (1914); *see also City Nat'l Bank v. Vanderboom*, 290 F. Supp. 592 (W.D. Ark. 1968), *aff'd*, 422 F.2d 221 (8th Cir. 1970) (applying Arkansas law). The *Stewart* court stated the basis of the rule as follows:

> The rule of law thus announced is the correct one, we think, for knowledge on the part of the maker of the note at the time the renewal is executed introduces the element of estoppel, which amounts to a waiver of the defense of failure of consideration which was theretofore open to him. The principle has been recognized by this court in the cases which hold that a contract void on account of usury may form the basis of a new contract or obligation to pay.

*Stewart*, 111 Ark. at 362, 163 S.W. at 1137 (citation omitted). Defenses held to have been waived by execution of renewal notes include fraudulent misrepresentation. *Sebastian Cnty. Bank v. Gann*, 121 Ark. 115, 180 S.W. 754 (1915).

When Hogan executed the second note in March 2014, he was aware that the loan proceeds had been disbursed and that the equipment had not been purchased with the proceeds. He also offered to substitute other collateral for the equipment that the loan was meant to purchase. He considered the second note to simply be the first note with different

8

collateral being offered. He also made substantial payments on the note. All of Hogan's asserted defenses—including impairment of collateral—existed prior to the execution of the second note. His execution of the second note and later making payments on that note were inconsistent with the preservation and assertion of those defenses. Accordingly, the circuit court did not err in finding that he had waived his affirmative defenses.

Nor did the circuit court err in finding that Hogan had waived his counterclaims for the same reasons he waived his defenses to repayment. In this point, Hogan does not directly address the court's ruling of his having waived his counterclaim other than to argue that the court blurred the line between affirmative defenses and counterclaims. He also argues the merits of his negligence counterclaim. Hogan asserts that a defense is not the same as a claim and that his counterclaim for negligence is still viable. He points to the court's letter opinion as indicating that the court believed that there was merit to Hogan's counterclaim.

Courts in other jurisdictions have used the waiver or estoppel analysis discussed above to hold that a counterclaim has been waived by the execution of a renewal note where the maker has knowledge of such claim at the time of renewal. *Resolution Tr. Corp. v. Palmetto Fort of Mt. Pleasant*, 831 F. Supp. 510 (D.S.C. 1993) (applying South Carolina law); *Vanderboom, supra*; *NationsBank, N.A. (So.) v. Peavy*, 488 S.E.2d 699 (Ga. Ct. App. 1997); *Lawler v. First Nat'l Bank of Nev.*, 576 P.2d 1121 (Nev. 1978).

Finally, in his third point, Hogan asserts that even if he were liable on the notes, he would still be entitled to a set-off equal to the value of the impairment of the collateral. The bank argues that the issue is not preserved for review because the circuit court did not specifically address a set-off because it found that Hogan had waived his defenses and claims.

9

Hogan does not address the preservation issue. We agree with the bank that the issue is not preserved.

Here, Hogan asserted the affirmative defense of impairment of collateral. However, the circuit court did not rule on the merits of whether BLR impaired the collateral. The court instead found that Hogan had waived his defenses to repayment by executing the second note and by making substantial payments on the note after learning the collateral had not been purchased. Clearly, the requirement of a ruling from a lower court is the elementary basis of this court's function, which is to review decisions of a circuit court and not to make them in the first instance on appeal. *TEMCO Constr., LLC v. Gann*, 2013 Ark. 202, at 13, 427 S.W.3d 651, 659–60. It is an appellant's responsibility to obtain a ruling to preserve an issue for appeal, and Hogan's failure to obtain a ruling precludes this court's review. *Id*.

Affirmed.

VAUGHT and HIXSON, JJ., agree.

*Mays, Byrd & Associates, P.A.*, by: *Richard L. Mays, Sr.*, for appellant.

*Wetzel & Moore, P.A.*, by: *J. Brad Moore*, for appellee.