Leroy NELSON and Avery NELSON
*v.* Ralph COTHAM, JR.

CA 79-94                               595 S.W. 2d 693
Court of Appeals of Arkansas
Opinion delivered February 13, 1980
Review denied March 19, 1980
Released for publication March 26, 1980

*Gannaway, Darrow & Hanshaw,* for appellants.

*Rose, Nash, Williamson, Carroll, Clay & Giroir,* by: *George E. Campbell & M. Jane Dickey,* for appellee.

JAMES H. PILKINTON, Judge. This litigation calls for a determination of whether, under the facts of the case, a person signing a negotiable instrument is an accommodation party under the Uniform Commercial Code, and is entitled to foreclose a lien upon the affected real property. The chancellor held for the alleged accommodation endorser, determined the amount of the disputed balance, and ordered foreclosure. The property owners have appealed, and we consider the case de novo.

Buxton Homes, Inc. (the "Corporation") was formed on July 15, 1975, as an Arkansas Corporation, the two stockholders of which were Ralph Cotham, Jr. ("Cotham") and Charles G. Buxton ("Buxton"). Buxton became the President of the Corporation, serving the Corporation on a full-time salaried basis as manager and engineer. Cotham served the Corporation on a part-time, non-salaried basis as Secretary-Treasurer, in which position he kept the corporate minute book, handled all funds and kept the financial records. Although apparently now insolvent, the Corporation has retained its corporate status under State law.

Prior to June, 1976, the Corporation held title to Lot 158, Longlea Addition of the City of Little Rock, Arkansas, which real property is the subject matter of this suit. Leroy V. Nelson and Avery Nelson (the "Nelsons") desired to purchase Lot 158, subsequently learned that it was owned by the Corporation, and contacted Buxton in order to com-

mence negotiations for the purchase of the lot. Eventually the Nelsons and the Corporation entered into a Construction Contract (the "Construction Contract") dated June 10, 1976, under which the Corporation agreed to build a house on Lot 158 for the price of $99,000.00. The Construction Contract was signed on behalf of the Corporation by Buxton. According to the contract, the sum of $99,000.00 also included the lot.

On July 28, 1976, the Corporation executed and delivered to Pulaski Federal Savings & Loan Association ("PFS") (now Savers Federal Savings & Loan Association) a note in the principal amount of $75,000.00 (the "Note"), with interest thereon at the rate of 8.75 per cent per annum from the date of disbursement. This Note was also signed by Buxton and Cotham individually. The proceeds from the Note were deposited into the Corporation's checking account. Concurrently with the execution of the Note, and for the purpose of securing payment thereof, the Corporation executed and delivered to PFS a mortgage (the "Mortgage") on Lot 158. This lien instrument provided specifically that the loan proceeds were to be used *solely* for and in construction of improvements and buildings *on the mortgaged property*. The Nelsons were not aware of this mortgage, and did not learn of it until much later when it became apparent that the Corporation was in deep financial trouble.

Construction of the house began, and on October 1, 1976, Nelsons paid to Buxton Homes their personal check No. 28 in the amount of $49,500.00, in accordance with the provision of the contract that one-half of the contract price would be paid when the roofing had been applied. Nelsons placed on this check the notation, "constructon of home at 34 Woodberry", which is the street address of Lot 158, Longlea Addition. Mr. Cotham also deposited this check into the Corporation's checking account.

Construction continued at a slow pace, due at least partially, according to Ralph Cotham, to the fact that Buxton Homes had over-extended itself by taking on too many construction projects.

In early June, 1977, the Nelsons moved into the house located on Lot 158.

On July 7, 1977, Nelsons issued to Buxton Homes their personal check in the amount of $10,969.43, and on this check Nelsons placed the notation, "payment of bills for 34 Woodberry as listed in letter of July 5, 1977".

Prior to August 22, 1977, Nelsons learned that Buxton Homes was in financial trouble, and shortly before that date Nelsons had learned for the first time that Buxton Homes had borrowed $75,000.00 from Pulaski Federal Savings & Loan Association of Little Rock and as security for the loan had executed a note and mortgage covering said Lot 158. Also, they learned from Charles Buxton and Ralph Cotham that nothing had been paid on the principal of this note, and therefore on August 22, 1977, Nelsons issued to Buxton Homes and Pulaski Federal their personal check in the amount of $44,372.57, placing on it the notation, "For balance of purchase price on House and Lot 158, Longlea Addition to the City of Little Rock, Arkansas".

The total of the three checks paid by Nelsons, as set out above, amounted to $104,842.00, or $5,842.00 more than the contract price of $99,000.00. This additional $5,842.00 was payment for some changes; and Ralph Cotham testified that the amount of $104,842.00 paid by the Nelsons covered the full contract price and also the changes agreed upon by the Nelsons and Buxton Homes, Inc.

The sum of $104,842.00, paid by Nelsons to Buxton Homes, added to the sum of $75,000.00 borrowed by Buxton Homes from Pulaski Federal, amounts to $179,842.00. However, $44,372.57 of this, as represented by Nelsons' third check, went to Pulaski Federal to apply to the note and mortgage on Lot 158, leaving a net balance of $135,469.43 received by Buxton Homes from the Nelsons and Pulaski Federal. Therefore, Buxton Homes received $30,627.43 more than the contract price and the changes, which is the exact amount of principal left owing to Pulaski Federal on the note and mortgage. Buxton Homes has paid nothing on this balance.

Ralph Cotham testified that from the time Buxton Homes, Inc. came into being Charles Buxton had been president and he had been secretary-treasurer, that they had been the only two stockholders, and that this same situation prevailed at the time of this trial. He also testified that through all of this time Charles Buxton had handled all of the construction undertaken by the Corporation because of his engineering qualifications, and that he, Ralph Cotham, had handled all of the finances of the corporation, including the payment of bills. He testified that he had deposited the money received from the Nelsons, and the $75,000.00 loan proceeds received from Pulaski Federal, in the general account of Buxton Homes and had used it to pay bills owed by Buxton Homes, including bills incurred on other construction projects being carried out by Buxton Homes.

At the trial, both Mr. and Mrs. Nelson testified that when they discovered that there was going to be an outstanding mortgage on their home, after they had paid in full the contract price and for the changes, they asked Ralph Cotham what happened to the rest of the money Buxton Homes had received on their home and, according to the Nelsons, he said, in substance, "It went to pay for bricks and boards in other houses". Mr. Cotham did not deny saying this, but testified that he could not remember saying it.

Buxton Homes executed to the Nelsons a note and second mortgage on another house being built by Buxton Homes, but the Nelsons received nothing whatsoever when that property was sold at a foreclosure sale. This note and second mortgage both provided that Buxton Homes continued to be obligated to pay the balance of the note and mortgage to Pulaski Federal, and Mr. and Mrs. Nelson testified that their accepting that note and mortgage was merely an effort on their part to get some money to apply on the mortgage that had been left in their laps.

Buxton Homes has no assets whatsoever, and Charles Buxton is living somewhere in the State of California.

The Corporation was and remains in default in payment of the Note. Since Pulaski Federal was not being repaid, as

had been promised by the Corporation, Buxton and Cotham, on March 28, 1978, PFS filed this action to foreclose its lien on the Nelson lot and home. After suit was filed, on April 25, 1978, Mr. Cotham paid this Note along with the balance due Pulaski Federal on some other notes covering other properties. He received the Note and PFS assigned to Cotham individually the Note and Mortgage on the Nelson home. The indebtedness of the Corporation under the Note as of January 3, 1979, amounted to $36,858 in principal and interest. No personal judgment is sought against the Nelsons. Mr. Cotham adopted the suit after the assignment and, as substitute plaintiff, and appellee here, now seeks to foreclose the lien on the Nelson home and lot. Mr. Cotham claims the rights of an accommodation endorser which, among other things, the Nelsons deny.

Appellants first argue that Ralph Cotham, Jr., received benefits from the proceeds of the Note to PFS and therefore he was a co-signer rather than an accommodation endorser, and cannot maintain this action.

Mr. Cotham was asked the following question:

Q. Where did the investment come from that went into the assets of Buxton Homes, Inc.?

A. The majority of it came from myself.

He also testified that as secretary-treasurer he handled all of the money matters of the Corporation, made all disbursements, paid all bills, and took care of the corporate books and records. All of these arrangements existed from the beginning of the business, and still existed at the time of trial, even though the Corporation had no assets. Mr. Cotham said that he deposited the $75,000 loan proceeds obtained from PFS into a Corporation bank account. He admits that these funds were commingled by him with other draws from other construction loans. Mr. Cotham said that while appellants' home was under construction, the Corporation was building five to seven houses, in addition to the house for appellants, and the Corporation got into financial trouble because it bit off more than it could chew. He admitted that some of the

loan proceeds went to pay prior indebtedness on the lot in question, and the remainder was used to pay materialmen, laborers and other expenses on various projects of Buxton Homes. This, of course, violated the terms of the Mortgage given to PFS. The Corporation had no money to pay Charles Buxton a salary, and Buxton left Little Rock in the fall of 1977. The last word Mr. Cotham had from him, Buxton was living in California. At the time of trial Buxton Homes had no assets.

It is clear from the record that the $75,000.00 was borrowed from PFS in order to fulfill the contract with appellants, but the proceeds were disbursed by Mr. Cotham, as secretary-treasurer, on various construction projects of the Corporation. This was obviously an effort to keep the Corporation, in which he had a substantial interest, afloat. The motive with which an act was done may be ascertained and determined by inference from the facts and circumstances connected with the transactions and the parties to it. *Seaboard Finance Co.* v. *Dorman,* 4 Conn. Cir. 154, 227 A. 2d 441 (1966), 90 ALR 3d 342. Mr. Cotham did keep the Corporation afloat at that time and, as an officer, director and stockholder, was benefited to that extent. *Lasky* v. *Berger,* Colo. App., 536 P. 2d 1157 (1975); *MacArthur* v. *Cannon,* 4 Conn. Cir. 208, 229 A. 2d 372, cert. den. 154 Conn. 748, 227 A. 2d 562 (1967).

In *Lasky* v. *Berger, supra,* the court affirmed a judgment dismissing a comaker's action to recover the amount he paid on the note from the other maker, where his primary purpose in signing the note was to benefit his business interests. The court said it was proper to consider that his business interests were in fact benefited even though that benefit was subsequently eliminated when he was required to pay the note, because the status of a party to a note must be determined based on the circumstances in existence *at the time the note was signed.* Accordingly, the court added in *Lasky* v. *Berger,* the receipt of benefits at that time could be considered as substantial evidence that the party did not sign as an accommodation maker but as a principal comaker. See also *Wohlhuter* v. *St. Charles Lumber & Fuel Co.,* 25 Ill. App. 3d 812, 323 N.E. 2d 134, aff'd 62 Ill. 2d 16, 338 N.E. 2d 179 (1975).

In *Reigler v. Riegler,* 244 Ark. 483, 426 S.W. 2d 789 (1968), the Arkansas Supreme Court said:

". . . The trial court based its decision on the ground that appellant did receive benefits from the proceeds of the note, and, therefore, she was a co-signer and *not* an accommodation signer. We think that is the correct rule, and we also find in the record substantial evidence to support that finding of fact.

On the 'fact' issue appellant testified, in essence: I assume we borrowed money to build our house; we borrowed some money from an aunt for that purpose; I did not put any money in the house, but did receive a half interest in it; I do not remember what the note to the bank was for; I cannot swear I did not receive any benefits from the note to the bank.

The burden was on appellant to prove she received no benefits. It was so held in the case of *Fisher* v. *The Rice Growers Bank,* 122 Ark. 600, 184 S.W. 36 and in *McArthur* v. *Cannon,* 229 A. 2d 372 (1967). Appellant appears to take the position it is immaterial as to whether or not she received benefits from the proceeds of the note, since the U.C.C. eliminated that element. The section of the U.C.C., relied on is Ark. Stat. Ann. § 85-3-415(1) (Add. 1961) which reads:

'An accommodation party is one who signs an instrument in any capacity for the purpose of lending his name to another party to it.'

However, in the McArthur case cited above, the court held that a signer who received benefits *from the proceeds of the note* was not an accommodation signer. The above *emphasized* words are, we think, the key to a correct interpretation of the Code. . . ."

To the same effect is the later case of *Hanson* v. *Cheek and Davant,* 251 Ark. 897, 475 S.W. 2d 526 (1972). See also 90 ALR 3d 342.

While PFS did insist that Mr. Cotham personally sign the Note before credit would be extended to the Corporation, this record shows that Cotham's purpose in signing the Note was not *solely* to lend his name as a surety to the other co-makers. We are persuaded that his primary purpose in signing the Note was to benefit his business interests by obtaining money to keep his corporation going with the expectation that it would ultimately repay the Note. Therefore he was not an accommodation endorser under the circumstances. We hold that his payment of the Note to PFS ended the matter as far as these appellants were concerned as Mr. Cotham was a comaker.

II

Even if it could be said that Mr. Cotham was a accommodation endorser, he would still not be entitled to foreclose this mortgage.

The Construction Contract predated the PFS loan. When the contract was executed Mr. and Mrs. Nelson certainly acquired an equitable interest in Lot 158, Longlea Addition to the City of Little Rock. While that interest would have been subordinate to the Pulaski Federal lien, it does not follow necessarily that Mr. Cotham, as assignee, is entitled to foreclosure under the circumstances here. In equity the strict letter of the law of subrogation, which would otherwise be available under the ordinary principles of suretyship, must yield to what is right. We are persuaded that it would be inequitable to permit Mr. Cotham to foreclose this particular mortgage under the facts of this case. Not only did Mr. Cotham commingle the $75,000 loan proceeds and spend part of it on other projects, he also took and commingled the $49,-500.00 paid by the Nelsons (and expended a part of it on other jobs) at a time when he knew of the bad financial condition of the Corporation.

What the Supreme Court of Missouri said in *Patzman* v. *Howey,* 340 Mo. 11, 100 S.W. 2d 851 (1936), might be quoted here:

Regardless of whether plaintiff was induced by

fraud to make the contract of purchase, it was fraudulent to take his money and keep on collecting from him without doing what was required to give him what he was paying for. That would be the same thing as taking his money knowing he would get nothing for it, and defendant would not be excused even if he thought that the land company would utlimately be able to make all the payments required by the Whitmer contract. See *Lynch* v. *Southern Mining Land & Lumber Co.,* 135 Mo. App. 672, 117 S.W. 624. Defendant had no right to play fast and loose in this transaction by recklessly, in the hope that everything would finally balance out, applying the money, paid by plaintiff, for other purposes than to make the deposits which would insure plaintiff a deed.

Considering the admitted condition of the Corporation, it is clear that Mr. Cotham dealt with these funds in a way which resulted in injury to the Nelsons. He did this at a time when he knew there was no reasonable certainty that the Corporation could pay PFS and deliver good title to appellants. An officer of a corporation is not personally liable for the wrongful acts of the corporation, unless he had some participation in it. *Hirsch* v. *Phily,* 4 N.J. 408, 73 A. 2d 173 at 177 (1950); *New England Box Co.* v. *Gilbert,* 100 N.H. 257, 123 A. 2d 833 at 835 (1956). See also 152 ALR 696 at 705. Mr. Cotham certainly participated in the events which led directly to the loss which now must remain upon him or fall upon the Nelsons. Under the circumstances, equity requires that Mr. Cotham absorb the loss. He cannot in good conscience be permitted to shift it to the appellants. *People's Bank* v. *Pioneer Foods,* 253 Ark. 277 at 282, 486 S.W. 2d 24 (1972).

There are therefore two reasons why we must reverse and dismiss this case. As indicated, Mr. Cotham was a co-maker of the PFS Note, and the lien was discharged when he paid the Note. Mr. Cotham cannot maintain this action for that reason. Also, and apart from that ground, Mr. Cotham's personal participation in a series of questionable events, leading to the loss sustained, makes it inequitable under the circumstances for him to now enforce the right of subrogation which he otherwise would enjoy under the ordinary prin-

ciples of suretyship. Equity cannot in good conscience enforce recourse on this mortgage.

Reversed and dismissed.