**BOARD OF COUNTY COMMISSIONS OF THE COUNTY OF PARK; Upper South Platte Water Conservancy District; Center of Colorado Water Conservancy District; Centennial Water & Sanitation District; and City of Thornton, Plaintiffs–Appellees,**

v.

**PARK COUNTY SPORTSMEN'S RANCH, LLP, a Colorado limited liability partnership; JJWM, LLP, a Colorado limited liability partnership; WIN Company, a partnership; Maude Company, a partnership; James E. Medema; Melvin W. Medema; James L. Jehn; Audley Schaap; and City of Aurora, Defendants–Appellants.**

No. 10CA0514.

Colorado Court of Appeals,
Div. III.

Oct. 27, 2011.

Rehearing Denied Jan. 5, 2012.

See also 105 P.3d 595.

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2010.

Wood, Ris & Hames, P.C., William A. Rogers, III, Rachel A. Morris, Brendan L. Loy, Denver, Colorado, for Plaintiffs–Appellees Board of County Commissions of the County of Park, Upper South Platte Water Conservancy District, and Center of Colorado Water Conservancy District.

Gilbert Y. Marchand, Jr., P.C., Gilbert Y. Marchand, Jr., Boulder, Colorado; Hahn, Smith, Walsh & Mancuso, P.C., John W. Smith, III, Denver, Colorado, for Plaintiff–Appellee Centennial Water & Sanitation District.

Margaret Emerich, City Attorney, Joanne Herlihy, Assistant City Attorney, Thornton, Colorado, for Plaintiff–Appellee City of Thornton.

Gary L. Crandell, P.C., Gary L. Crandell, Denver, Colorado, for Defendants–Appellants Park County Sportsmen's Ranch, LLP, and JJWM, LLP.

Benjamin, Bain & Howard, LLC, James W. Bain, Greenwood Village, Colorado, for Defendants–Appellants WIN Company, Maude Company, James E. Medema, Melvin W. Medema, James L. Jehn, and Audley Schaap.

Carpenter & Klatskin, P.C., Willis Carpenter, Robert R. Marshall, Jr., Judith C. McNerny, Denver, Colorado, for Defendant–Appellant City of Aurora.

Opinion by Judge WEBB.

Defendants, Park County Sportsmen's Ranch, LLP (PCSR), JJWM, LLP, WIN Company, Maude Company, James E. Medema, Melvin W. Medema, James L. Jehn, Audley Schaap, and the City of Aurora, appeal the jury verdicts and trial court judgments in favor of plaintiffs, the Board of County Commissioners of the County of Park, Upper South Platte Water Conservancy District, Center of Colorado Water Conservancy District, Centennial Water & Sanitation District, and the City of Thornton, on their claims of fraudulent conveyance, civil conspiracy, successor liability, and quiet title. We affirm in part and reverse in part.

## I. Facts

The Medemas, Jehn, and Schaap (individual defendants) formed Trident, a general partnership, which purchased a ranch in Park County with the goal of obtaining and selling water rights. In 1996, Trident entered into an agreement with Aurora (Trident Agreement), whereby Aurora would assist financially and technically with applying for water rights, and if successful, purchase those rights from Trident. The Trident Agreement also provided that if Trident did not obtain water rights, "Aurora shall receive title to those portions of the fee lands ... which lie below 9,360 feet in elevation" (approximately one-half of the ranch), without encumbrances. Later in 1996, the Trident Agreement was amended to reflect that Trident had become PCSR. Aurora recorded the amended agreement.

In 1998, Guaranty Bank (Guaranty) loaned PCSR $2.6 million for legal and engineering expenses in the water case. The promissory note matured in 2002, after the water court had denied the application and plaintiffs had moved for costs. To renew the note, Guaranty required individual defendants to co-sign a deed of trust on the ranch and a principal reduction. After individual defendants made capital contributions to PCSR, it reduced the outstanding principal balance and executed a new $1.6 million balloon note, secured by a deed of trust on the ranch. Individual defendants also signed the note. Aurora and Guaranty agreed to subordinate the deed of trust to Aurora's right to receive one-half of the ranch under the Trident Agreement.

In 2003, the water court entered a judgment against PCSR for costs of over $1.1 million. Plaintiffs recorded transcripts of the judgment against the ranch. In 2005, the supreme court affirmed the denial of PCSR's application for water rights and the costs judgment.[1]

Shortly thereafter, PCSR's four remaining partners—James Medema, James Jehn, WIN Company (owned by Melvin Medema), and Maude Company (owned by Audley Schaap)—formed JJWM.[2] JJWM and the four partners took out an uncollateralized loan from Guaranty for the outstanding balance on the 2002 note, which JJWM then purchased from Guaranty using the loan proceeds, and was assigned the deed of trust. Thereafter, PCSR made no payments on the note.

By 2006, the note was in default and JJWM instituted foreclosure proceedings against PCSR on the deed of trust. At the foreclosure sale, JJWM successfully bid the amount due on the note. No junior lienholder redeemed and a public trustee's deed to JJWM was recorded. Later, JJWM quitclaimed a portion of the ranch to Aurora in settlement of all obligations under the Trident Agreement.

Plaintiffs' claims against defendants (except Aurora) alleged that (1) under the Colorado Uniform Fraudulent Transfer Act (CUFTA), §§ 38–8–101 to –112, C.R.S.2011, foreclosure of the deed of trust securing the 2002 note constituted a fraudulent transfer; (2) defendants conspired to commit such fraud; and (3) JJWM is liable for PCSR's debts as a successor entity. In addition, Thornton sought a quiet title decree that because it had not received notice of the foreclosure, its judgment lien survived and was superior to Aurora's quitclaim deed.

---

1. *City of Aurora ex rel. Utility Enterprise v. Colorado State Engineer,* 105 P.3d 595 (Colo.2005).

2. Kenneth J. Burke, one of the original partners in PCSR, ceased to be a partner in 2003.

The jury found in favor of plaintiffs on all claims. On the civil conspiracy claim, it awarded damages in the amount of the judgment liens. On a special verdict form, the jury found that individual defendants did not sign the 2002 note as accommodation parties, which was essential to the fraudulent conveyance claim.

Based on the jury's verdicts on the fraudulent conveyance and successor liability claims, the court ordered that plaintiffs' original judgment liens reattach to the ranch (now owned by JJWM). The court also found in favor of Thornton on its quiet title claim and voided the quitclaim deed from JJWM to Aurora.

## II. Summary

We reverse the judgment on the fraudulent conveyance and civil conspiracy claims for lack of evidence supporting the special verdict that individual defendants were not accommodation parties. We affirm the judgment in part on the successor liability claim, but except for Thornton, reverse it as to reestablishing plaintiffs' liens. On the quiet title claim, we reverse the judgment voiding Aurora's quitclaim deed. We remand for further findings on the priority between the deed and Thornton's lien, which we conclude was not extinguished by the foreclosure.

## III. Evidence of Fraudulent Transfer

Defendants first contend the jury's verdict under CUFTA is not supported by sufficient evidence. We agree and conclude that the verdict must be set aside.

We examine whether the evidence, considered in the light most favorable to the prevailing party, is sufficient to support the jury's verdict. *Hildebrand v. New Vista Homes II, LLC*, 252 P.3d 1159, 1172 (Colo. App.2010). The jury weighs the evidence, determines the credibility of witnesses, and draws all justifiable inferences of fact from the evidence. *Id.*

Under section 38–8–105(1)(a), C.R.S.2011, a debtor's transfer of property is fraudulent if made "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." A "transfer" under CUFTA includes "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with *an asset* .... " § 38–8–102(13), C.R.S.2011 (emphasis added). However, an "asset" does not include "[p]roperty to the extent it is encumbered by a valid lien." § 38–8–102(2)(a), C.R.S.2011.

Here, individual defendants argue that the evidence is insufficient to show the ranch constituted an "asset" under CUFTA, because when JJWM foreclosed, it was subject to Aurora's recorded right to one-half of the acreage under the Trident Agreement, and the balance on the 2002 note secured by the 2002 deed of trust exceeded the value of the remainder. Plaintiffs dispute that the ranch was encumbered by the 2002 deed of trust, which they assert had been extinguished when individual defendants, who were primarily liable on the 2002 note, "purchased" the note from Guaranty in 2005. *See, e.g., Liddle v. Lechman*, 114 Colo. 189, 204, 163 P.2d 802, 809 (1945).

Individual defendants respond that they were not primarily liable on the note, but rather signed as accommodation parties. In that capacity, after having purchased the note, they were entitled to reimbursement from PCSR and to enforce the note and the deed of trust against PCSR under section 4–3–419(e), C.R.S.2011. Thus, whether the ranch was an "asset" under CUFTA depends on whether individual defendants signed the 2002 note as accommodation parties under section 4–3–419. We agree that defendants were accommodation parties.

### A. Accommodation Party

In 1994, the General Assembly adopted Uniform Commercial Code (UCC) section 3–419 in section 4–3–419, C.R.S.2011, which provides in relevant part:

(a) If an instrument is issued for value given for the benefit of a party to the instrument ("accommodated party") and another party to the instrument ("accommodation party") signs the instrument for the purpose of incurring liability on the instrument *without being a direct beneficiary of the value given* for the instrument, the instrument is signed by the accommodation party "for accommodation."

(b) An accommodation party may sign the instrument as maker, drawer, acceptor, or indorser....

(c) A person signing an instrument is presumed to be an *accommodation party* and there is notice that the instrument is signed for accommodation *if the signature is an anomalous indorsement or is accompanied by words indicating that the signer is acting as surety or guarantor* with respect to the obligation of another party to the instrument....

....

(e) An accommodation party who pays the instrument is entitled to reimbursement from the accommodated party and is entitled to enforce the instrument against the accommodated party.

(Emphasis added.)

 Whether a signer is an accommodation party presents a question of fact, *see* § 4–3–419 cmt. 3, and "must be determined based upon the facts and circumstances in existence at the time the note is signed." *Lasky v. Berger*, 536 P.2d 1157, 1160 (Colo. App.1975) (not published pursuant to C.A.R. 35(f)). The party claiming accommodation party status bears the burden of proof. *Cranfill v. Union Planters Bank*, 86 Ark. App. 1, 158 S.W.3d 703, 712 (2004).

 No Colorado case has addressed accommodation party status under section 4–3–419. Because this section parallels the UCC, we look to other jurisdictions that have interpreted their UCC counterparts for guidance. *See* § 4–1–103(a)(3), C.R.S.2011 (purpose of UCC is "[t]o make uniform the law among the various jurisdictions"); *Georg v. Metro Fixtures Contractors, Inc.*, 178 P.3d 1209, 1214 (Colo.2008) (examining other states' UCC decisions).

### 1. Plain Language of the Note

Individual defendants signed the 2002 note under the term "BORROWER," both as "PARTNER" and "INDIVIDUALLY." Nothing in the note indicated that individual defendants were accommodation parties.

According to plaintiffs, this fact suffices to support the jury's verdict under *Rink–A–Dinks v. TNT Motorcycles, Inc.*, 655 P.2d 431, 432 (Colo.App.1982) (applying the prior accommodation party statute, former section 4–3–415). There, the division rejected accommodation party status, explaining: "Where parties sign a note as individuals ... without any qualifying designations, they are individually liable as makers." *Id.* at 432–33.

Under section 4–3–419(c), the use of certain qualifiers after a signature, such as "guarantor," creates a presumption that the signer is an accommodation party. As explained in Comment 3 to this section:

[I]t is almost always the case that a co-maker who signs with words of guaranty after the signature is an accommodation party. The same is true of an anomalous indorser.... [Therefore,] signing with words of guaranty or as an anomalous indorser ... creates a presumption that the signer is an accommodation party.

A party challenging accommodation party status can rebut this presumption "by producing evidence that the signer was in fact a direct beneficiary of the value given for the instrument." *Id.*

 Contrary to *Rink–A–Dinks*, however, section 4–3–319 does not create the opposite presumption if such qualifiers are absent. Rather, as explained in 6B Lary Lawrence, *Anderson on the Uniform Commercial Code* 649 (3d ed.2003)[3], without such qualifiers:

[A]n examination of the instrument will not, in itself, disclose the existence of an accommodation relationship. This is the case when there are co-parties, such as co-makers, and nothing is added to the instrument to show that one of them is signing for accommodation.

Because former section 4–3–415 did not include any language similar to section 4–3–419(c), nor did it specify that an accommodation party could sign as a "maker," we decline to follow *Rink–A–Dinks*. *See City of Steamboat Springs v. Johnson*, 252 P.3d 1142, 1147 (Colo.App.2010) (a division of the

---

**3.** *See Cugnini v. Reynolds Cattle Co.*, 687 P.2d 962, 966 n. 8 (Colo.1984) (quoting *Anderson on* the *Uniform Commercial Code* with approval).

court of appeals is not bound to follow another division's ruling).

Rather, we conclude that under section 4-3-419(c), the lack of qualifiers cannot alone defeat accommodation party status. Therefore, because here no such qualifiers are present, we look for evidence showing that individual defendants received a direct benefit from the value given for the note, and find none.

### 2. Direct Benefit

An accommodation party "signs the instrument for the purpose of incurring liability ... without being a direct beneficiary of the value given for the instrument ...." § 4-3-419(a). Thus, unlike former section 4-3-415-which described an accommodation party merely as "one who signs the instrument in any capacity for the purpose of lending his name to another party to it"—section 4-3-419 focuses on the benefit received by the signer. Further, it "distinguishes between direct and indirect benefit." § 4-3-419 cmt. 1.

No Colorado case has addressed what constitutes a direct benefit under section 4-3-419. Plaintiffs rely on *Lasky*, 536 P.2d at 1160, to argue that because the renewal note furthered individual defendants' business interests in PCSR, they received a "direct benefit." *Lasky* rejected accommodation party status where the plaintiff had negotiated a loan to a franchisee of his corporation and signed the loan as an individual, which the franchisee used to pay a debt to the corporation. The division explained that the plaintiff "would qualify as an accommodation party only if his purpose in signing the note was to lend his name as a surety to [the president of the franchise]." 536 P.2d at 1159. It concluded that the plaintiff was not an accommodation party because his "primary purpose in signing the note was to benefit his business interests...." *Id.*

*Lasky* is inapposite for two reasons. First, it was decided under former section 4-3-415, which focused on whether the party signed "for the purpose of lending his name to another party," rather than on any direct benefit received. Second, to the extent Lasky addressed a benefit to the signer, it did not distinguish between direct and indirect benefits, nor did it identify any direct benefit that the signer received.

Cases under former section 4-3-415 that fail to distinguish between direct and indirect benefit—such as the "business interests" in *Lasky*—are unpersuasive under section 4-3-419. *See generally* Neil B. Cohen, *Suretyship Principles in the New Article 3: Clarifications and Substantive Changes*, 42 Ala. L.Rev. 595, 600 (1991) ("The drafters improved the definition of 'accommodation party' by discarding the perhaps chivalrous concept of lending one's name to another party and by adopting instead the economic concept of incurring liability without being a direct beneficiary of the value given for the benefit of another party."). Although "[i]t is hard to say just what constitutes a direct benefit," James J. White & Robert S. Summers, *Uniform Commercial Code Practitioner Treatise Series* § 16-11(a) (5th ed. 2008), we look to other jurisdictions that have addressed "direct benefits" under UCC section 3-419.

In *Citibank v. Van Velzer*, 194 Ariz. 358, 982 P.2d 833 (Ariz.Ct.App.1998), the court concluded that a partner who signed a loan to a partnership as a "principal" was nevertheless an accommodation party because the partner "received no direct benefit from [the bank] [and] his limited partnership interest was only an indirect benefit of the value given." *Id.* at 836. The court explained that the partner's "credit was necessary for [the bank] to fund the loan" because the partnership was not credit-worthy and "had no substantial assets other than the real property...." *Id.* at 835.

In *Commercial Mortg. and Finance Co. v. American Nat'l Bank & Trust Co.*, 253 Ill. App.3d 697, 191 Ill.Dec. 745, 624 N.E.2d 933, 938 (1993), the court reversed a trial court judgment, following a bench trial, that a shareholder was not an accommodation party. It concluded that the "trial court's findings were against the manifest weight of the evidence" where "[t]he loan was made to the corporation" and the evidence did not show that the shareholder "received any of the $200,000 loan proceeds, but, rather, she testi-

fied that the money was deposited in [the corporation's] account and it was used to improve the real estate." *Id.*, 191 Ill.Dec. 745, 624 N.E.2d at 937–38.

In *Plein v. Lackey*, 149 Wash.2d 214, 67 P.3d 1061, 1065 (2003), the court concluded that a corporate officer was an accommodation party where "[t]he direct beneficiary of the loan was the corporation" and "[a]s a stockholder ... any benefit obtained by [the officer] was derivative and indirect." *Id.* at 1064–65. As in *Citibank*, the court explained that "[i]n addition to the direct/indirect benefit inquiry, another factor that serves to establish accommodation party status is that the lender would not have made the loan in the absence of the party's signature on the note...." *Id.* at 1065.

We consider these cases well reasoned because they are supported by comment 1 to section 4–3–419, which provides the following example to distinguish direct from indirect benefit:

> [I]f X cosigns a note of Corporation that is given for a loan to Corporation, X is an accommodation party if no part of the loan was paid to X or for X's direct benefit. This is true even though X may receive indirect benefit from the loan because X is employed by Corporation or is a stockholder of Corporation, or even if X is the sole stockholder so long as Corporation and X are recognized as separate entities.

*See Thompson v. United States*, 408 F.2d 1075, 1084 n. 15 (8th Cir.1969) ("Official Comments to the Uniform Commercial Code are not binding upon the courts but they are persuasive in matters of interpretation ...."); *cf. In re Estate of Royal*, 826 P.2d 1236, 1238 (Colo.1992) (looking to comments to the Uniform Probate Code).

Here, uncontroverted documentary evidence showed that Guaranty required individual defendants to sign the 2002 note because PCSR's water court application had failed. But since the 2002 note was a renewal, defendants' evidence focused on the proceeds from the original 1998 loan. That evidence showed the original loan was used

solely to finance legal and engineering fees associated with the water case. Nothing in the record indicates that individual defendants either received any loan proceeds or otherwise directly benefited from them. Rather, financing the water court case and the subsequent appeal directly benefited PCSR. Plaintiffs presented no contrary evidence

However, receipt of loan proceeds is not the only way to establish a direct benefit. Because the 2002 note was a renewal rather than an advance of additional funds, a broader inquiry is appropriate.

In *Cranfill*, 158 S.W.3d at 710, the court provided the following examples of a direct benefit to the co-signer of a business loan who did not receive any loan proceeds: disbursement of the proceeds releases the signer from a personal obligation; disbursement settles a legitimate legal controversy adverse to the co-signer; or the cosigner has the expectation of employment or ownership interests.[4] But here, plaintiffs had no personal obligations that were released or employment prospects with PCSR, nor was any legal claim settled.

Nevertheless, plaintiffs assert that individual defendants received a direct benefit because PCSR was a "single-purpose, single-asset entity," with the sole objective of profiting individual defendants, and when the 2002 note was signed, PCSR's application for water rights had failed and individual defendants "were aware plaintiffs were seeking a large costs judgment." These assertions do not show any direct benefit.

PCSR's sole purpose to acquire water rights is immaterial to whether individual defendants received a direct benefit from the loan. Comment 1 to section 4–3–419 makes clear that a benefit is indirect even if the signer is the sole stockholder in a corporation that directly benefits from the loan. We perceive no basis on which to apply a different analysis to partners in a limited partnership that has a single purpose, nor do plaintiffs suggest one.

4. To the extent *Cranfill* cites *Nelson v. Cotham*, 268 Ark. 622, 595 S.W.2d 693 (Ark.Ct.App.1980), as illustrating a fourth example, we decline to follow it because, like *Lasky*, it was decided under former section 3–415 and did not address direct benefits.

Because individual defendants were not parties to the water court case and plaintiffs did not seek costs against them, a potential cost judgment could have been awarded only against PCSR. As limited partners, they had no personal liability for a judgment against PCSR. *See* § 7–80–705, C.R.S.2011. Nor do plaintiffs assert that PCSR can be disregarded as a separate entity.

Accordingly, because the evidence does not show that individual defendants received a direct benefit from the 2002 note—or, for that matter, the initial loan—we must overturn the jury's finding that they did not sign as accommodation parties.

## B. The Ranch Did Not Constitute an Asset

■ As accommodation parties, individual defendants were entitled to enforce the note against PCSR, and their acquisition of the note did not extinguish the deed of trust. *See generally Murray v. Payne*, 437 So.2d 47, 52 (Miss.1983) ("Upon payment, the [accommodation party] is said to 'stand in the shoes' of the creditor."); *In re TML, Inc.*, 291 B.R. 400, 429 n. 64 (Bankr.W.D.Mich. 2003) ("when one is secondarily liable, e.g., an accommodation party under the UCC, the fact that the debt was paid by that party, whether or not the debt was secured by a mortgage, will not extinguish the underlying debt, nor will it discharge the liability of the party primarily liable"). Plaintiffs do not argue otherwise.

Here, plaintiffs' expert testified that the ranch was worth $920 per acre or approximately $2.2 million in total. He did not distinguish the acreage subject to Aurora's claim under the Trident Agreement, and no other evidence was presented as to the value of this portion of the ranch. Therefore, on this limited record, we must conclude that the remaining one-half of the ranch, approximately 1,200 acres, would have been worth about $1.1 million. But the entire ranch was encumbered by the deed of trust securing the 2002 note with a balance of approximately $1.6 million.

Therefore, because the ranch was encumbered by valid liens that exceeded its value, we conclude that it was not an "asset" under CUFTA. *See, e.g., In re Valente*, 360 F.3d 256, 260 (1st Cir.2004) (under Rhode Island's version of the Uniform Fraudulent Transfer Act (UFTA), property worth $150,000 but encumbered by a $168,000 first mortgage "did not qualify as an 'asset' ⁞ ... at the time of the transfer"); *Epperson v. Entertainment Express, Inc.*, 338 F.Supp.2d 328, 343 (D.Conn.2004) (property and note encumbered by security interests that exceeded their value were not assets under Connecticut's Uniform Fraudulent Transfer Act), *aff'd*, 159 Fed.Appx. 249 (2d Cir.2005); *Farstveet v. Rudolph ex rel. Eileen Rudolph Estate*, 630 N.W.2d 24, 34 (N.D.2001) ("Property which is encumbered by valid liens exceeding the value of the property is not an asset ... and is not subject to a fraudulent transfer."); Barkley Clark & Barbara Clark, *The Law of Secured Transactions Under the Uniform Commercial Code* § 4.15: "Sham Foreclosure Sales and Successor Liability" (2010) ("This result makes policy sense, because the purpose behind fraudulent conveyance law is to allow creditors to recover what they would have recovered had the transfer not taken place.").

Alternatively, plaintiffs argue that "any interest Aurora had in the Ranch Property ... was terminated, with Aurora's agreement, on January 7, 2008." However, whether the ranch constituted an asset is determined at the time of the alleged fraudulent transfer, which plaintiffs alleged occurred in 2006 when JJWM foreclosed on the deed of trust and obtained a public trustee's deed to the ranch. *See* § 38–8–109(3), C.R.S.2011. At that time, the supreme court had affirmed the water court case, and Aurora's right to one-half of the ranch was no longer contingent.

Accordingly, we further conclude that because the ranch did not constitute an asset under CUFTA, the jury's verdict on that claim must be reversed.

## IV. Conspiracy

Defendants next contend that if the CUFTA claim fails, the jury's verdict on civil conspiracy must be reversed because it was

based on the alleged fraudulent transfer, which plaintiffs do not dispute. We agree.

■ Civil conspiracy is a derivative cause of action that is not independently actionable. *Double Oak Constr., L.L.C. v. Cornerstone Development Int'l, L.L.C.*, 97 P.3d 140, 146 (Colo.App.2003). "[T]he essence of a civil conspiracy claim is not the conspiracy itself, but the actual damages resulting from the acts done in furtherance of the conspiracy." *Id.* (quoting *Resolution Trust Corp. v. Heiserman*, 898 P.2d 1049, 1055 (Colo.1995)). Thus, if the acts alleged to constitute the underlying wrong provide no cause of action, then no cause of action arises for the conspiracy alone. *Id.*

Here, plaintiffs' conspiracy claim was based on the underlying wrong of the alleged fraudulent transfer. Thus, because we have concluded that the evidence did not support that claim, we must also set aside the jury's verdict of liability for civil conspiracy and the damages awarded.[5]

## V. Successor Liability

Defendants next contend the jury's verdict on successor liability must be reversed. We decline to do so.

■ Generally, a corporation that acquires the assets of another corporation does not become liable for its debts. However, successor corporations are liable if one of the following exceptions applies: (1) the successor expressly or impliedly assumes liability; (2) the transaction results in a merger or consolidation of the two corporations; (3) the successor is a mere continuation of the seller; or (4) the transfer is for the fraudulent purpose of escaping liability. *CMCB Enters.,*

*Inc. v. Ferguson*, 114 P.3d 90, 93 (Colo.App. 2005).

### A. Transfer of an Asset

Defendants argue that the jury's verdict must be reversed because, as a matter of law, an "essential prerequisite" of successor liability is a transfer of assets from seller to buyer, which did not occur here because (1) PCSR did not directly transfer the ranch to JJWM, but rather JJWM acquired it through foreclosure, and (2) the ranch was not an "asset" because it lacked equity. Both arguments fail.

■ In *CMCB Enterprises, Inc.*, 114 P.3d at 93, the division noted that "a prerequisite for the imposition of liability against a corporation as a mere continuation of a predecessor is a sale or transfer of ... the assets of the latter to the former." [6] However, no Colorado case has addressed whether the indirect transfer of assets through a foreclosure sale supports successor liability. The majority of courts to do so have concluded that it does. *Fletcher Cyclopedia of Corporations* § 7122, at 220 (2008) ("Successor liability may be imposed even where the business assets were purchased pursuant to a foreclosure sale.").[7]

For example, in *Stoumbos v. Kilimnik*, 988 F.2d 949, 962 (9th Cir.1993), the court held that "[t]he mere fact that the transfer of assets involved foreclosure on a security interest will not insulate a successor corporation from liability where other facts point to continuation." Otherwise, it explained, "unscrupulous businesspersons would be able to avoid successor liability and cheat creditors merely by changing the form of the transfer." *Id.* at 961.

---

5. Based on this conclusion, the jury's award of money damages for civil conspiracy is set aside. Therefore, we need not address defendants' arguments related to prejudgment interest.

6. We leave for another day whether such a sale or transfer must involve "all the assets."

7. *See Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 124 F.3d 252, 267 (1st Cir.1997) ("[E]xisting case law overwhelmingly confirms that an intervening foreclosure sale affords an acquiring corporation no automatic exemption from successor liability."); *Glentel, Inc. v. Wireless Ventures,*

*LLC*, 362 F.Supp.2d 992, 1000 (N.D.Ind.2005) ("Defendants have failed to provide, and the Court has not discovered, authority that supports the preclusion of a claim of successor liability against a purchaser of assets at a [foreclosure sale]...."); *Glynwed, Inc. v. Plastimatic, Inc.*, 869 F.Supp. 265, 273–74 (D.N.J.1994) ("Despite [defendant's] predictions of the gloom and doom that will descend upon the area of commercial law if the Court permits [plaintiff] to proceed on its theory, nothing in the UCC supports [defendant's] argument that the 9–504 sale provides a safe harbor against successor liability claims.").

Similarly, in *Continental Ins. Co. v. Schneider, Inc.*, 582 Pa. 591, 873 A.2d 1286, 1294 (2005), the court held that a successor liability claim could proceed against an entity that had purchased the debtor's assets in a foreclosure sale: "if the unsecured creditor can establish that one of the exceptions to the general rule against successor liability applies, it may collect the predecessor's debt from the successor." We consider the reasoning in these cases persuasive and follow them here.

Defendants' argument that the ranch did not constitute an "asset" for successor liability purposes also fails, although we have concluded that it lacked equity.[8]

In *Ed Peters Jewelry Co.*, 124 F.3d at 262, the owners of a debtor corporation and a bank holding a first lien on the corporation's assets agreed to conduct a private foreclosure sale where a new corporation, comprised of the same owners, would acquire the assets. The court held that such a transfer was not fraudulent as to a junior lienholder because, as here, more senior liens exceeded the value of the assets foreclosed on.

Nevertheless, the court concluded that the new corporation could be liable under the doctrine of successor liability. It explained that the lack of equity in the asset did not preclude successor liability:

> Whereas liens relate to assets (viz., collateral), the indebtedness underlying the lien appertains to a person or legal entity (viz., the debtor). Thus, although foreclosure by a senior lienor often wipes out junior-lien interests in the same collateral, it does not discharge the debtor's underlying obligation to junior lien creditors .... [T]he successor liability doctrine focuses exclusively on debt extinguishment, be the debt secured or unsecured.

*Id.* at 267 (citations omitted). Further, the court explained that the debtor corporation

"unquestionably remained legally obligated" to the creditor despite the foreclosure and extinguishment of the creditor's lien. *Id.*; see also *Continental Ins. Co.*, 873 A.2d at 1292 ("[T]here is a distinction between permitting an unsecured creditor to assert a lien against assets that have been sold pursuant to a ... foreclosure sale and permitting an unsecured creditor to assert a claim of successor liability against the purchaser of that collateral.").

Similarly, here, although the foreclosure sale extinguished plaintiffs' judgment liens (except that of Thornton) on the ranch, PCSR remained legally obligated to pay those judgments. Hence, lack of equity in the ranch is immaterial to JJWM's liability for the debts of PCSR. Therefore, lack of equity in an asset does not alone preclude successor liability.

## B. Sufficient Evidence

We next conclude that the evidence supports the jury's verdict that JJWM was liable as a successor corporation on at least one theory.[9]

The "mere continuation" exception for successor liability applies to a continuation of directors, management, and shareholders. *CMCB Enters., Inc.*, 114 P.3d at 93. Thus, a court must assess "whether the purchasing corporation is, in effect, a continuation of the selling corporation, and not whether there is a continuation of the seller's business operation." *Id.*

Here, the evidence, taken in the light most favorable to the verdict, showed:

- PCSR's four remaining partners are the same four partners of JJWM.
- Both partnerships had the purpose of overseeing the obligations under the Trident Agreement.

8. We reject plaintiffs' argument that this issue was not preserved because in opposing instruction 32, defendants argued that successor liability must be based on "the value of the asset at the time of transfer."

9. Although the jury was instructed on three of the four exceptions to successor liability, we need only determine that the evidence is sufficient to support one of those theories. *Cf. People v. Dunaway*, 88 P.3d 619, 631 (Colo.2004) (where the evidence presented at trial is otherwise sufficient to support the determination of guilt on one theory, providing the jury with an instruction containing a factually insufficient theory of liability for the same offense does not violate due process).

• JJWM acquired the sole asset of PCSR.

• The ranch was also JJWM's sole asset.

This evidence is sufficient to support the jury's verdict on successor liability under the mere continuation exception. *See CMCB Enters., Inc.*, 114 P.3d at 94 (finding successor liability based on mere continuation where "inadequate assets ... left in the old corporation ... prevent[ed] it from being able to pay its debts").

## C. Equitable Remedy

Defendants next argue that the trial court erred by reattaching plaintiffs' original judgment liens to the ranch owned by JJWM. We agree in part.

■■■ Initially, we reject defendants' arguments that because the ranch lacked equity, the trial court erred by instructing the jury to award the amount of plaintiffs' judgment liens on their successor liability claim, and even if this instruction was proper, the jury's verdict in favor of plaintiffs on successor liability must be set aside because it was inconsistent with the jury's award of zero damages on this claim.[10]

Any error in the damages instruction was harmless for two reasons. First, the jury did not award damages for successor liability. Second, once the jury determined JJWM to be the successor of PCSR, awarding money damages was unnecessary because JJWM became liable for all debt of PCSR. *See Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 215 F.3d 182, 186 (1st Cir.2000) (explaining that plaintiff's successor liability claim does not "involve the computation of damages" but rather "is an action to recover on debts, the amounts of which have been reduced to judgments"). Therefore, any inconsistency between the verdict and the damages instruction was also harmless.

However, we must still consider defendants' assertion that "[t] he court reinstated

Creditors' liens without addressing how reinstatement could occur without voiding the foreclosure sale or the Ranch's transfer to JJWM." Beyond reiterating their position that the deed of trust ceased to exist because the individual defendants were not accommodation parties, plaintiffs do not explain how their judgment liens could survive a valid foreclosure.[11] Given the jury's "no" answer to the special interrogatory on accommodation party status and plaintiffs' failure to request that the foreclosure sale be voided, the trial court had no reason to explain the consequences of the foreclosure on plaintiffs' liens beyond its order that they reattach.

■■■ A trial court "possesses broad discretion in fashioning an equitable remedy...." *See Schreck v. T & C Sanderson Farms, Inc.*, 37 P.3d 510, 515 (Colo.App. 2001). We will not disturb such a ruling absent an abuse of discretion—action that is manifestly arbitrary, unreasonable, or unfair. *La Plata Med. Ctr. Assocs., Ltd. v. United Bank*, 857 P.2d 410, 420 (Colo.1993).

■■■ Here, the trial court concluded:

In light of the jury's verdict in this case in favor of plaintiffs ... for fraudulent conveyance and successor liability, the court finds that the plaintiffs' original judgment liens from 2003 and 2005 should and will attach to the [ranch] now owned by JJWM with the date of priority back to their original filing by the plaintiffs.

However, because we have held that individual defendants were accommodation parties, we must conclude that the foreclosure sale was valid. The successor liability verdict does not require a contrary conclusion. *See Continental Ins. Co.*, 873 A.2d at 1293 (explaining that succeeding on a successor liability claim "will only permit [plaintiff] to proceed against [defendant] as [a] successor": "Accordingly, there is simply no merit to the ... assertion that a successful successor lia-

---

**10.** Although successor liability is an equitable doctrine, here the parties agreed to a jury trial on this issue. *See Ed Peters Jewelry Co.*, 124 F.3d at 267 ("successor liability is an equitable doctrine, both in origin and nature"); *Rego v. ARC Water Treatment Co.*, 181 F.3d 396, 401 (3d Cir. 1999) (observing that successor liability "is derived from equitable principles").

**11.** To the extent that plaintiffs argued before the trial court that they lacked notice of the foreclosure, only Thornton made this argument on appeal.

bility claim will 'undo' an otherwise valid [foreclosure] sale."). Hence, for the following reasons, we further conclude that, except for Thornton's lien, the foreclosure extinguished the other plaintiffs' judgment liens.

Under the version of section 38–38–501 in effect at the time of the foreclosure, *see* Ch. 275, sec. 2, § 38–38–501, 1990 Colo. Sess. Laws 1669, after the period of redemption, title to the foreclosure property "shall be free and clear of all liens and encumbrances junior to the lien foreclosed." The record is undisputed that, except as discussed below regarding defective notice to Thornton, the foreclosure was proper. Therefore, we conclude that title vested in JJWM, as grantee of the public trustee's deed, free and clear of the other plaintiffs' judgment liens.[12]

Based on this conclusion, the trial court's order attaching plaintiffs' original judgment liens to the ranch must be reversed, except as to Thornton.

### VI. Quiet Title Claim

Aurora contends the trial court erred by (1) finding lack of notice to Thornton of the foreclosure; and (2) voiding Aurora's quitclaim deed from JJWM for a portion of the ranch.

In reviewing a trial court's decision, we must view the evidence in its totality and in a light most favorable to the court. *Coors v. Security Life of Denver Ins. Co.,* 112 P.3d 59, 67 (Colo.2005).

We conclude that because the record shows the notice to Thornton was defective, the foreclosure did not extinguish its judgment lien. However, based on our conclusion that no fraudulent transfer occurred under CUFTA, we reverse the court's order voiding the quitclaim deed. Further, we remand for factual findings to determine the priority between Thornton's judgment lien and Aurora's deed.

In 2008, JJWM and Aurora agreed to settle PCSR's obligations under the Trident Agreement. Under the settlement agreement, JJWM quitclaimed to Aurora a portion of the ranch somewhat different than what

had been described in the Trident Agreement, although all land conveyed to Aurora was within the legal description of the ranch contained in the Trident Agreement. Aurora presented evidence that the original allocation, which was based on elevation, was not followed because it "adversely affect[ed] ... the value of and access to the Property." Aurora recorded the quitclaim deed.

Thornton sought a quiet title decree that "its interest in the [ranch] was not extinguished by the foreclosure by JJWM ... and that its lien against the [ranch] currently exists as first lien on the property." According to Thornton, its notice of JJWM's foreclosure was mailed to an incorrect address, its judgment lien was recorded in 2005, and it recorded a lis pendens of the pending litigation before the settlement agreement and recording of the quitclaim deed.

### A. Notice to Thornton

■ Aurora first argues that Thornton's judgment lien was extinguished by the foreclosure because Thornton failed to overcome the presumption that notice mailed to it was received. We disagree.

Under the foreclosure statutes then in effect, Thornton was "the holder of an interest junior to the lien being foreclosed" and had a right to cure or redeem from the foreclosure. *See* Ch. 275, sec. 2, §§ 38–38–104(1), 38–38–303, 1990 Colo. Sess. Laws 1657, 1666. Former section 38–38–103(2) provided in pertinent part:

> The combined notice required by subsection (1) of this section shall be mailed to those persons who have a right to cure or redeem pursuant to an instrument evidencing such right which was recorded.... *Such combined notice shall be mailed to such persons at their respective addresses shown in the recorded instruments through which their rights to cure or redeem are derived.*

Ch. 275, sec. 2, § 38–38–103(2), 1990 Colo. Sess. Laws 1656 (emphasis added); *see also* Ch. 275, sec. 2, § 38–38–101(7)(a), 1990 Colo. Sess. Laws 1654.

---

12. This conclusion does not preclude these plaintiffs from refiling their liens or otherwise enforc-

ing their cost judgments against JJWM, as successor to PCSR.

Properly addressed foreclosure notices are presumed to reach the addressee. *See Stark Lumber Co. v. Keystone Inv. Co.*, 92 Colo. 259, 262, 20 P.2d 306, 307 (1933). But here, the record shows, and the parties do not dispute, that Thornton's notice was addressed incorrectly. Thus, the record supports the trial court's finding that "JJWM failed to properly notify Thornton of the foreclosure proceeding by mailing it to the wrong address."

Further, even assuming that such a presumption arose, Thornton submitted sufficient evidence to overcome it, viewed in the light most favorable to the court's decision. Thornton presented affidavits of five city employees attesting that they did not recall having received the foreclosure notice. During trial, the city attorney who prepared the affidavits testified about the chain of custody for mail at the Thornton offices and why these five employees would have received the notice if it had been delivered.

Because Thornton did not receive notice of the foreclosure, it was an "omitted party" under former section 38–38–506(1):

> "[O]mitted party" means any person who: (a) Subsequent to the recording of a mortgage, deed of trust, or other lien instrument, has … acquired a record interest in the property subject to sale … and (b) … is not notified of his right to cure and redeem….

Ch. 275, sec. 2, § 38–38–506(1), 1990 Colo. Sess. Laws 1672–73.

Aurora argues that as an omitted party, Thornton's only remedy under former section 38–38–506 would be to redeem the ranch for an amount in excess of the bid. It relies on former section 38–38–506(2)(a), which provided:

> The interest of an omitted party in the property … may be terminated if such omitted party, *in a civil action commenced by any interested person*, is afforded rights of cure and redemption upon such terms as the court may deem just under the circumstances, which terms shall not, however, be more favorable that such person's statutory rights.

Ch. 275, sec. 2, § 38–38–506(2)(a), 1990 Colo. Sess. Laws 1673 (emphasis added). We are not persuaded.

Former section 38–38–506(2)(a) establishes a process through which an interested party can terminate an omitted party's interest. This process is necessary because under former section 38–38–506(2)(b), "the lien which is the subject of the sale shall not be extinguished by merger with the title to the property … until the interest of any omitted party has been … terminated…." Ch. 275, sec. 2, § 38–38–506(2)(b), 1990 Colo. Sess. Laws 1673; *see* Robert A. Holmes, *Public Trustee Foreclosure in Colorado* 3–15 n. 42 (3d ed. 2011) ("section 38–38–506(2)(b) keeps the lien foreclosed alive until the appropriate steps are taken either to affirm or to terminate the interest"). But here, no such proceeding has been commenced.

Rather, we conclude that because Thornton did not receive notice of the foreclosure, JJWM took title to the ranch subject to Thornton's judgment lien. This conclusion is supported by former section 38–38–501, which provides:

> Upon the expiration of the period of redemption … title to the property sold shall vest in the holder of the certificate of purchase…. *Subject to the provisions of section[ ] 38–38–506 … such title shall be free and clear of all liens and encumbrances junior to the lien foreclosed.*

Ch. 275, sec. 2, § 38–38–501, 1990 Colo. Sess. Laws 1669 (emphasis added).

### B. Voiding the Quitclaim Deed

Aurora next argues that even if Thornton's judgment lien survived the foreclosure, the trial court erred by voiding its quitclaim deed. We agree.

Following trial, the court entered judgment in favor of Thornton and voided the quitclaim deed. In doing so, it found that Aurora "actively participated in the scheme of the partnerships and the partners to avoid the judgment" and "chose to endorse and seek the benefits of the sham conversion of the partnership by acceptance of the conveyance of different property than that to which it was entitled." The court also found

that while Aurora "had a priority lien to the [ranch] under the original Trident agreement ... that priority was forfeited or voided when it negotiated with JJWM ...." It voided Aurora's quitclaim deed because "the partnerships, PCSR and JJWM, and the partners of each attempted to commit, and did commit, fraud by the transfer of the property to the new partnership."

But we have concluded that no fraudulent transfer occurred because the ranch was not an asset under CUFTA. Hence, the partners did not commit fraud. And while the record supports the trial court's finding that the partners intended to extinguish plaintiffs' judgment liens by purchasing the 2002 note, not funding PCSR so it could make payments on it, and then foreclosing through JJWM, their intent is immaterial because no fraudulent transfer occurred. *See Megabank Financial Corp. v. Alpha Gamma Rho Fraternity,* 841 P.2d 318, 320 (Colo.App.1992) ("So long as the transfer does not diminish the estate, the motives of debtor and grantee are immaterial.").

Accordingly, the judgment voiding Aurora's quitclaim deed on this basis must be reversed.[13]

### C. Lien Priority

Our conclusion that Thornton's judgment lien was not extinguished by foreclosure requires resolution of Aurora's argument that its interest in the ranch is senior to Thornton's judgment lien because the quitclaim deed relates back to the Trident Agreement. Thornton responds that because the 2008 agreement terminated any interest Aurora had under the Trident Agreement, Aurora's quitclaim deed is junior to the judgment lien. Although the trial court noted that "Aurora had a priority lien" under the Trident Agreement, it did not address priority relative to the 2008 agreement, apparently because it had voided the quitclaim deed. We conclude that further findings are required.

Initially, Thornton argues that because Aurora's interest in the ranch was conditional on the outcome of the water case and had not been conveyed before the foreclosure, its lien had priority. However, assuming this argument was preserved, Thornton cites no authority, we have not found any in Colorado, and *Province v. Johnson,* 894 P.2d 66, 68 (Colo.App.1995) ("a person exercising an option to purchase real property has priority over the person who, after the granting of the option and before its exercise, purchased the property with notice thereof"), is to the contrary.

However, because the trial court voided the quitclaim deed, it made no findings whether Aurora was exercising its option under the Trident Agreement through the 2008 agreement, or whether its interests under the Trident Agreement had terminated. Nor did the court address Thornton's assertions that Aurora did not exercise its rights under the Trident Agreement because the quitclaim deed involved different property, which could have a different value, and because Aurora negotiated the 2008 agreement with JJWM rather than PCSR. We conclude that such factual issues are inappropriate for resolution on appeal and must be addressed by the trial court on remand.[14] Hence, the court shall make specific findings on priority, but shall not take additional evidence.

Accordingly, we affirm the trial court's order as to Thornton's lack of notice, reverse its order voiding the quitclaim deed, and remand for further findings on whether Aurora's quitclaim deed is superior to Thornton's judgment lien.

The judgment is affirmed in part, reversed in part, and the case is remanded for further findings.

Judge ROY and Judge FOX concur.

---

**13.** Based on this conclusion, we decline to address Aurora's additional argument that Thornton did not request the court to void the deed.

**14.** Thornton acknowledges that this issue is moot if it obtains payment of its judgment lien from the cash supersedeas bond posted by defendants. We express no opinion whether the bond covers Thornton's lien.